**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY KAYE HARRIS, | ) | CASE NO:   1:08-cv-00246 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| NATIONAL CITY CORPORATION, *et al.*, | ) | |
| | ) | **MEMORANDUM** |
| Defendants. | ) | **OPINION AND ORDER** |

This case is before the magistrate judge by consent of the parties.  Before the court is the motion of plaintiff, Mary Kaye Harris "Harris") for judgment on the administrative record.  (Doc. No. 34.)  Defendants, National City Corporation and National City Corporation Welfare Benefits Plan ("collectively, "National City"), oppose Harris' motion.  (Doc. No. 35.)  Also before the court is the motion of National City for judgment on the administrative record.  (Doc. No. 33.)  Harris opposes National City's motion.  (Doc. No. 36.)  For the reasons given below, the court GRANTS Harris's motion in part and DENIES it in part.  The court also DENIES defendants' motion.

### I.  Background

Harris worked for National City in student loan customer service.  While she was an employee of National City, she was covered by  the National City Corporation Welfare Benefits Plan, Long-Term Disability Plan Option ("the Plan").

**A.     The Plan's Provisions**

The Plan defines "disability" as "inability, by reason of a medically determinable physical or mental impairment, to engage in substantial and gainful activity."   Transcript ("Tr."), p. NCC00444.  After two years, a Plan participant must be totally disabled to receive long-term benefits.  The Plan defines "totally disabled" as "unable to perform, with reasonable continuity, all of the duties of any occupation for which a Disabled Participant is or could become qualified by education, training and experience, as determined by the Plan Administrator in its discretion . . . . "  Tr. at NCC00446.

Additionally, the Plan requires claimants seeking benefits to produce a health care provider's medical verification of disability, proof that the claimant continues to be under the regular care of a physician, and evidence that the claimant is receiving any appropriate available treatment.  Tr. at NCC00319.   Further, a claimant "must provide this proof at your own expense whenever the Plan Administrator requests it."  *Id*.

According to Section 6.1 of the Plan:

> A Participant's continued eligibility for Long-Term Disability Benefits is conditioned upon the Participant's furnishing to the Named Fiduciary, at the time the Participant makes a claim for Benefits and from time to time thereafter at the Named Fiduciary's request, medical verification of the Long-Term Disability satisfactory to the Plan Administrator, obtained from medical examinations made by a physician or other health care provider selected by the Named Fiduciary in its sole discretion.

Tr. at NCC00448.  Entitlement to benefits ends when "[y]ou are no longer disabled, as defined in the Plan and determined by the Plan Administrator" or, alternatively, under the following circumstance:

> You fail to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due or

-2-

providing proof of a continued disability or partial disability and proof of continued regular care by a physician.

Tr. at NCC00327.

**B.      Initial Determination of Disability**

In February of 2003, Harris suffered cardiac arrest while at home and another later at the hospital.  Tr. at NCC00277.  Physicians attributed the arrests to a birth defect that required the use of a pacemaker.  Subsequently, Harris had problems with confusion, difficulty thinking, and short-term memory.  On January 21, 2004, Harris visited Jack Anstandig, M.D., a neurologist, for treatment.  Tr. at NCC00277-82.  Dr. Anstandig administered a variety of physical and mental tests.  He concluded that Harris's symptoms, including impaired short-term memory and impaired calculation and directional skills, were consistent with the residual effects of anoxic encephalopathy. Dr. Anstandig scheduled a variety of MRI, CT, and PET scans and bloodwork.  He also planned mental therapy and possible pharmacology.  He advised Harris to refrain from driving.

Dr. Anstandig saw Harris again on January 28, 2004.  Tr. at 00274.  He noted that the results of Harris's bloodwork and other tests had been normal.  This confirmed his diagnosis of post anoxic encephalopathy.  He recommended that Harris apply for short-term disability, refrain from driving, and return in four weeks for a follow-up.

On February 10, 2004, Dr. Anstandig completed a Restrictions Form at the request of Liberty Mutual, National City's delegee in administering the plan.  Tr. at NCC00292.  On his completed form, he opined that Harris suffered from post anoxic encephalopathy with residual memory impairment and impaired control function

-3-

processing.  According to Dr. Anstandic, Harris had trouble with learning, memory, calculations, and directions, as evidenced by impaired cognition following cerebral hypoxia.  He stated that on February 4, 2004 he had begun treating Harris with Aricept.

Liberty Mutual telephoned Harris on March 29, 2004.  Tr. at NCC00270.  Harris said that the Aricept and mental exercises had helped her feel 75% better, although she was not yet driving.  She also said that she had missed her last appointment with Dr. Anstandig due to her father's health problems and her husband's work schedule.  Although Harris had another appointment on April 28, 2004, she was told that she needed to see her doctor earlier to assess her current condition.  Nevertheless, Liberty Mutual approved her application for short-term benefits on March 29, 2004, effective February 16, 2004 and lasting until April 15, 2004.  Tr. at NCC00269-70.  In the letter notifying Harris of the approval, Liberty Mutual reminded her that if her benefits were ever overpaid, Liberty Mutual had the right to recover the overpayment in full.

**C.    Award of Long-Term Benefits from Liberty Mutual**

On April 20, 2004, Paula Hubbard ("Hubbard"), a case manager with Liberty Mutual, faxed Dr. Anstandig an urgent request for information about Harris's recent condition.  Tr. at NCC00264.  Dr. Anstandig responded on May 6, 2004.  Tr. at NCC00257.  He stated that Harris had reported a slight improvement in memory with Aricept but that she still experienced significant memory difficulties.  The only other abnormality noted by Dr. Anstandig was some difficulty in finding words.  The doctor reported that he had raised Harris's dosage of Aricept, continued his recommendation that Harris refrain from driving, and ordered a follow-up in two months.  He also requested that Harris bring her husband with her when she returns so that he could

-4-

describe Harris's daily functioning.

Hubbard wrote Harris on June 3, 2004 to inform her that her benefits had been extended through July 8, 2004.  Tr. at NCC00250.  The letter also told Harris, "If your condition should warrant benefits beyond this date your physician must complete the enclosed form(s) and return in the envelope provided by July 10, 2004.  If we do not receive a response from you or your physician, your claim will be closed."  Tr. at NCC00250.

On June 6, 2004, Harris signed a Disability Payment Option Agreement at the behest of Liberty Mutual.  Tr. at NCC0023.  By signing, Harris agreed to apply for Social Security benefits; to appeal any denial of such application; to notify Liberty Mutual immediately if she received Social Security, retirement, or worker's compensation benefits; and to repay Liberty Mutual within 30 days any amount received from Liberty Mutual that becomes an excessive payment due to an award of benefits from another source.  The agreement also informed Harris that if she failed to repay to Liberty Mutual any overpayment, Liberty Mutual could withhold long-term disability payments until the overpayment was recovered.

Victoria Vespa ("Vespa"), a senior disability claims manager for Liberty Mutual, wrote Harris on June 7, 2004 to warn her that as the end of Harris's period of short-term disability was approaching, Liberty Mutual was evaluating her continued eligibility.  Tr. at NCC00235.  Vespa also told Harris that if Harris's application for long-term disability were approved, she would receive benefits effective August 9, 2004.

On June 15, 2004, Harris completed a series of questionnaires for Liberty Mutual.  Tr. at NCC0025-32.  Among other information, Harris disclosed that she had

-5-

three medical providers in the previous two years:  Dr. Anstandig, her neurologist;

Daniel Chagin, her general practitioner; and Dr. Gerald M. Burma, a cardiac specialist.

Tr. at NCC00230.  Liberty Mutual wrote to each of these physicians in late June or early

July for information about Harris's condition.  Tr. at NCC00213-24.

On July 12, 2004, the Cleveland Cardiovascular Clinic, Inc. faxed Liberty Mutual

its uncompleted Restrictions Form with the notation that the Clinic had not seen Harris

since May 13, 2003.  Tr. at NCC00210-12.

Dr. Anstandig completed a Restrictions Form for Liberty Mutual on July 22, 2004.

Tr. at NCC00202-07.  He diagnosed Harris as suffering from post anoxic

encephalopathy resulting in chronic memory impairment.  Dr. Anstandig opined that

Harris had problems with learning, memory retention, calculations, and directions.  He

also noted that she was having no significant response to medication.  Clinical notes

from July 14, 2004 reported that Harris continued to have persistent difficulty with

memory and did not notice much change on the Aricept.  Dr. Anstandig referred her to

the Neuropsychology Department at the Cleveland Clinic for further treatment and to

her family physician for routine follow-ups.

Vespa wrote a letter to Harris on August 3, 2004, notifying her that Harris's short-

term benefits would be expiring soon and that long-term benefits would begin effective

August 9, 2004.  Tr. at NCC00194-97.  The standard long-term benefit was to be

$1,111.17 per month prior to authorized deductions.  *Inter alia*, the letter also notified

Harris that it would not deduct estimated Social Security benefits from Harris's benefits

from Liberty Mutual if Harris applied for Social Security benefits, forwarded a copy of

her application, and agreed to reimburse National City through Liberty Mutual for any

-6-

overpayment of benefits resulting from a retroactive award of Social Security benefits.

Vespa also told Harris that if it did not have a copy of Harris's Award Certificate or

denial notice from Social Security within 17 months from the start of her disability, it

would begin deducting estimated social security benefits from Harris's benefits from

Liberty Mutual.

**C.      Award of Social Security Benefits and Loss of Long-Term Benefits from Liberty Mutual**

On February 14, 2005, Vespa wrote three letters to Harris.  Tr. at NCC00064-65.

One told her that as of August 1, 2005, the date 17 months from the start of Harris's

disability, Liberty Mutual would be deducting an estimated Social Security disability

award from Harris's disability payments from Liberty Mutual.  The deductions of an

estimated award would continue until Liberty Mutual received either a copy of Harris's

Social Security Award Certificate or copies of a denial notice and a request for

reconsideration.  A second letter asked Harris to complete within 30 days an enclosed

set of forms to allow Liberty Mutual to evaluate her continued eligibility for disability.

The third letter informed Harris that Liberty Mutual had contacted Drs. Chagin, Burma,

and Anstandig to obtain information needed to support her disability claims.  *See* Tr. at

NCC00176-84.  It also asked her to contact her doctors to ensure that Liberty Mutual

received the needed information by March 15, 2005.  Absent this needed information,

the letter continued, Liberty Mutual would make a disability decision based on the

information in its file.

Vespa faxed Drs. Chagin, Burma, and Anstandig on February 14, 2005, asking

for additional tests and office notes regarding Harris's condition.  Tr. at NCC553-61.  Dr.

-7-

Anstandig completed his response to Liberty Mutual's request for further information about Harris's condition on February 17, 2005.  Tr. at NCC00175.  He did not provide any answers to the substantive questions on Liberty Mutual's Physical Capacities Form. Rather, he wrote in response to the question, "Can the person work 8 hours per workday?," the following:  "Unknown.  Last seen 7/14/04.  Recommended referred to Cleveland Clinic for further evaluation & treatment."  Dr. Anstandig included his clinical notes from Harris's visit on July 14, 2004 with his response.  Tr. at NCC00173.

Harris completed a questionnaire regarding her abilities on February 22, 2005 at the request of Liberty Mutual.  Tr. at NCC00166-71.  She stated that she suffered from confusion in new places, had problems paying attention, forgot things, had trouble doing two things at once, and had trouble with numbers.  An Activities Questionnaire completed on the same day stated that Harris could sit for four hours, stand for one hour, and walk for one hour; sat for four hours a day, stood for one and a half hours a day, and walked for one and a half hours a day; could sit in a car for four hours; could drive for two hours; could carry and put away groceries; could cook and clean up afterwards; could wash floors, clean bathrooms, vacuum, do laundry, open and respond to mail; could manage finances and balance a checkbook; could bathe, dress, and style hair; and could feed herself, use the bathroom, and go up and down stairs.  Her daily activities included watching TV, reading books, and playing with her grandson.

In about April 2005, the Social Security Administration found Harris disabled as of February 21, 2003.  Tr. at NCC00054.  They awarded her $780.00 per month beginning August 2003, including a back payment of $15,839.00 for the months from August 2003 through April 2005.

-8-

Vespa wrote Harris again on July 1, 2005.  Tr. at NCC00153-54.  She noted that upon contacting Harris's physicians, Dr. Anstandig had stated that he had not seen Harris since October 12, 2004 and that Dr. Burma had seen her only once, on February 15, 2005.  Vespa reminded Harris that she was required to prove continued physician's care and prove compliance with a treatment plan.  She asked Harris, therefore, for help in ensuring that Liberty Mutual receive the records of her visits to Dr. Anstandig on October 12, 2004 and to Dr. Burma on February 15, 2005.  Vespa also asked that Harris have her treating physician complete a set of enclosed forms and reminded Harris that proof of filing for Social Security benefits must be received by July 2005.  Finally, the letter notified Harris that if the requested information were not received by July 30, 2005, any disability payments that Harris was currently receiving would be suspended.

Dr. Burma faxed to Liberty Mutual on July 1, 2005 the records of Harris's visit of February 15, 2005 and an echocardiograph taken the same day.  Tr. at NCC00150-51.  The echocardiograph found normal left ventricular systolic function, a mild tricuspid insufficiency, and mild pulmonary hypertension.  Dr. Burma found the echocardiograph to be normal.  He noted that Harris had been diagnosed at her last visit with severe hypertension with blood pressure in the range of 200/110.  He had prescribed Benicar, and that day her blood pressure was 115/80.  Dr. Burma diagnosed Harris as suffering from hypertension, sick sinus syndrome, and status post permanent pacemaker, and he told her to return in six months.

Liberty Mutual faxed Dr. Anstandig on July 1, 2005 asking for Harris's medical records from the office visit of October 12, 2004.  Tr. at NCC00533.  Dr. Anstandig

-9-

replied on July 7, 2005 that he had last seen Harris on July 14, 2004 and that Liberty Mutual had already been sent that information twice.  Tr. at 00532.

Liberty Mutual received on August 5, 2005 a copy of the notice of Harris's award from Social Security.  Tr. at NCC00146.  A note entered into the computer record of Harris's account with Liberty Mutual by Lisa Fennig ("Fennig") and dated August 5, 2005 stated that Fennig had called Harris and asked her to have her husband ("A. Harris") call Fennig.  Tr. at NCC0057.  A. Harris returned the call.  Fennig told A. Harris that Harris's account was being turned over to Peggy Roberts ("Roberts") and that Harris's recent disability award from Social Security would require an adjustment in the amount paid Harris by Social Security and a return of overpayments made by Liberty Mutual.  A. Harris told Fennig that Harris continued to suffer from significant memory problems and depression.  He also requested that all correspondence regarding Harris be sent in his name, as Harris tended to lose or misplace mail addressed to her.  He also said that Harris could be trusted with telephone messages, as she wrote them down as she received the calls, and that Harris did not open mail addressed to him.

Roberts wrote Harris on August 5, 2005, noting her recent disability award from Social Security.  Tr. at NCC00055-56.  Roberts asked Harris to send her documentation of the amount of her disability award so that Roberts could calculate the amount by which the disability benefit from Liberty Mutual should be reduced and the amount of overpayment for which Harris should reimburse Liberty Mutual.

Dr. Burma faxed to Liberty Mutual a completed Attending Physician's Statement on August 8, 2005.  Tr. at NCC00136-37.  It noted Harris's ailments, gave her prognosis as good, and listed February 15, 2005 as the only visit with Harris.  Dr. Burma did not

list any impairments suffered by Harris, instead noting that he had not performed a functional evaluation of Harris.

Dr. Anstandig examined Harris on August 10, 2005.  Tr. at NCC00490-91.[1]  In an attending physician's statement for Liberty Mutual, completed on March 27, 2006, Dr. Anstandig repeated that he diagnoses Harris as suffering from post anoxic encephalopathy and that her prognosis was unchanged.  He asserted that Harris suffered from severe limitations in her functional capacity and was incapable of minimum activity.  He also stated that he had referred Harris to the Brain Injury Center for further follow-up and that he was not Harris's treating physician at this time.

On August 15, 2005, Pam Thompson ("Thompson"), a financial specialist with Liberty Mutual, sent  a letter  to A. Harris telling him that because Harris had been awarded Social Security benefits, Liberty Mutual City had to adjust Harris's disability award.  Tr. at NCC00052-53.  Thompson asked A. Harris to send to her a copy of Harris's Notice of Award letter so that Thompson could calculate the amount by which Harris's benefit from Liberty Mutual should be reduced and the amount of overpayment that Harris should return to Liberty Mutual.

Thompson wrote A. Harris again on August 18, 2005.  Tr. at NCC00045-46. Thompson pointed out that because Harris was receiving from Social Security a total monthly payment of $727.00 as of August 1, 2003, a payment which had gradually increased to $780.00 a month by January 1, 2005, Harris's payments from Liberty

---

[1]  Apparently, the notes from this visit were not included in the record until Harris's appeal of the denial of benefits.  *See* Plaintiff's Opposition to Defendant's Motion for Judgment on the Administrative record (Doc. No. 36), pp. 4-5 n.11.

Mutual would be reduced from $1,111.17 per month to $368.17 per month.  Thompson also noted that Liberty Mutual's full payment to Harris in months when she had been receiving disability benefits from Social Security meant that Liberty Mutual had overpaid Harris by $8,718.80.  Thompson asked A. Harris to reimburse Liberty Mutual for that amount.

A Tracking Sheet from September 2005 used by National City in administering Harris's account included an appended a post-it note stating, "Send all correspondence to husband."  Tr. at NCC00040.

Roberts wrote Dr. Chagin on October 26, 2005, asking for treatment notes from March 1, 2005 to the present and that he complete an enclosed Functional Mental Status form evaluating Harris's condition.  Tr. at NCC 00088.  The letter warned that failure to provide this information may result in the denial of Harris's disability claim.

On December 5, 2005, Roberts wrote to Harris that Liberty Mutual was reviewing her continued eligibility for long-term disability payments.  Tr. at NCC0086.  Roberts noted that Liberty Mutual had contacted Dr. Chagin for necessary information, and she asked Harris to request that Dr. Chagin send that information.  Roberts also told Harris that information regarding Harris's continued eligibility was needed by December 31, 2005.  If that information were not forthcoming by that date, Liberty Mutual would suspend Harris's disability payments.

Roberts wrote Harris again on January 9, 2006 to notify Harris that her disability payments had been suspended.  Tr. at NCC00085.  The letter noted that Liberty Mutual had not received the information it needed from Dr. Chagin.  It also informed Harris that her file would remain open until February 7, 2006 to allow Harris to submit the

information needed to continue her eligibility for long-term benefits.  Roberts sent Harris

a second letter repeating this information on February 1, 2006.  Tr. at 00084.  The

February 1 letter apparently used the January 9, 2006 letter as boilerplate, thereby

creating a contradiction.  The January 9 letter had said that the file would remain open

for 30 days, until February 7, 2006.  The February 1 letter also said that the file would

remain open for 30 days--until February 7, 2006.

On February 14, 2006, Roberts wrote Harris to inform her that, based on the

information provided to Liberty Mutual, her claim for long-term benefits had been denied

effective January 1, 2006.  Tr. at NCC00081-83. Roberts also noted that if Harris no

longer met the requirements for continuing as a disabled plan participant, her

employment with National City may be terminated.  The letter also included the

following:

> We have written to your general practitioner, Dr. Daniel Chagin on October 26,
> 2005 and December 5, 2006, requesting treatment notes for the time period of
> March 1, 2005 through the present time.  We also requested Dr. Chagin
> complete a Functional Mental Status form, this information is needed in order to
> evaluate whether or not you continue to meet the definition of disability.  We
> requested Dr. Chagin return the requested information to us by November 22,
> 2005.  To this date we have not received a response to our request and
> therefore are not able to determine if you are restricted from performing the
> material and substantial duties of your occupation.
>
> On December 5, 2005, January 9, 2006 and February 1, 2006, we mailed you a
> letter advising that we requested medical information from Dr. Daniel Chagin on
> October 26, 2005.  We also contacted you via telephone at the following number
> XXX-XXX-XXXX, on January 6, 2006 and February 1, 2006, advising we have
> not received your medical information.  To this dat we have not been able to
> speak with you directly. . . .
>
> The most recent medical information we have on file is from your cardiologist Dr.
> Gerald Burma, dated February 15, 2005.  You were treated for Hypertension,
> Sick Sinus Syndrome and you are status post permanent pacemaker.  Dr. Burma
> indicated in his treatment note, you presented with severe hypertension and your

blood pressure was in the range of 200/110.  He started you on Benicar therapy and requested you have an echo study done that day.  The results of the Echocardiography indicated a normal left ventricular systolic function, mild tricuspid insufficiency and mild pulmonary hypertension.  The results of the echocardiography of February 15, 2005, when compared to the February 25, 2005 study, indicated there has been no significant changes [sic].

Although Dr. Burma indicated you had severe hypertension and your blood pressure was in the range of 200/110 at the time you presented for your office visit, Dr. Burma has not indicated in his treatment notes your specific restrictions and limitations precluding you from returning to work.

Since we did not receive the necessary proof to verify ongoing disability, no further benefits will be paid and your file will be closed.  Benefits have been paid through December 31, 2005 and your claim is closed as of January 1, 2006.

Tr. at NCC00082 (punctuation and capitalization in the original).  The letter also informed Harris of her right to appeal the decision terminating her benefits.

**D.    Appeal of Loss of Benefits from Liberty Mutual**

On February 21, 2006, Liberty Mutual wrote to Harris asking for her authorization to speak to A. Harris regarding her claim.  Tr. at NCC00130.  Harris signed the authorization, and Liberty Mutual received it by March 3, 2006.  Liberty Mutual also wrote to Dr. Chagin's office on February 21, 2006, requesting that Dr. Chagin perform a mental status examination and treatment notes from March 2005 to the present.  Tr. at NCC00126.

Liberty Mutual wrote Dr. Burma on March 9, 2006 asking for evaluations of Harris's condition, apparently enclosing a copy of Roberts' February 14, 2006 letter to Harris.[2]  On March 9, 2006, Dr. Burma responded by letter as follows:

We reviewed your letter of 02/14/06 concerning Mary Kaye Harris' disability.  The letter is very misleading, in that it documents Mrs. Harris' hypertension and

_____

[2]  This letter to Dr. Burma is not in the record.

-14-

> permanent pacemaker status, but ignores the underlying reason for Mrs. Harris'
> disability.  We made it very clear in our paper work that we do not perform
> functional evaluations in our office and we do not perform neurologic
> evaluations.

Tr. at NCC00125.

Harris and A. Harris wrote to the claims appeal committee on March 14, 2006,

asking for a review of the denial of Harris's claim.  Tr. at 00477.  The letter stated in

relevant part:

> Mary Kaye Harris is presently suffering from accute short term memory losses.
> Letter [sic] have been sent to her and she put them away and forgot that they
> came.  She also received some [phone] calls as to her requirements for
> continuation of benefits, but again forgot that she even received a call.
>
> I intercepted a phone call from a Peggy Roberts about her claims.  She informed
> me she was not [allowed] to talk to me about my wife's claim.  I have since filled
> out the forms required to speak on [behalf] of my wife.  I have since talked to
> Peggy Roberts and found out what has been going on, and how my wife has not
> followed up with the letters and phone calls.  I am now trying to get all the
> iformation [sic] that you are requesting from her.  I have to talk to all the doctors
> involved in her claim and ask for up dates to her condition.  I will be submitting
> them to you as soon as I get all of them.
>
> Mary Kaye Harris has also been evaluated by the Social Security system and
> also determined to be incompetent [sic], and unable to work.  I have been
> named her guardian in this matter.

The letter was forwarded to Kelly Blum ("Blum"), Chairperson of the Claims Committee,

at National City.  Tr. at NCC00105.

On March 31, 2006, Harris's attorney forwarded to the plan administrator medical

records from Dr Anstandig.  Tr. at NCC00489-91.  Those records asserted that Dr.

Anstandig was not currently treating Harris and had no information regarding her

condition since he had last seen her.

Blum wrote the Harrises on April 19, 2006, informing them that any additional

-15-

documentation must be received by May 22, 2006 to be considered on appeal.  Tr. at NCC00506.  An internal e-mail from Blum to Roberts on April 20, 2006 noted that Liberty Mutual had not yet received any additional medical information from Harris to support her appeal.  Tr. at NCC00131.  It asked Roberts for a copy of Harris's file so that a decision could be made on the basis of the information already available.

On May 19, 2006, Harris's attorney forwarded to the plan administrator a report from Barry S. Layton, Ph.D., a psychologist certified by the American Board of Professional Psychologists and the American Board of Clinical Neuropsychologists at Case Western Reserve University.  Tr. at NCC00481-88.  The report was based on examinations of Harris on April 17, 2006 and May 2, 2006 and on Harris's medical records.  After reviewing Harris's medical history and parts of Liberty Mutual's processing of her claim, Dr. Layton noted that A. Harris reported that Harris was unable to find her way around in unfamiliar places while driving or walking, was unable to prepare food from simple recipes, and spent most of her day home alone.

Dr. Layton administered the following tests to Harris:  Porteus Maze Test, Wisconsin Card Sorting Test, Cognitive Estimations Test, Test of Practical Judgment, Weschler Adult Intelligence Test-III (Similarities, Digit Span, Arithmetic, Information), Wide Range Achievement Test-3 (Reading), Controlled Oral Word Search Test, Boston Naming Test Writing Sample, Woodcock Reading Mastery Test (Revised-Passage Comprehension), Arithmetic Calculations Screening Test, Vertical Comprehension Screening Test, Nonverbal Sequencing Span Test, Benton Facial Recognition Test, Temporal Orientation Test, Virtual Design Copy and Recall Test, and California Verbal Learning Test-II.  He found that despite Harris's good social presentation, Harris

suffered from severe deficits in executive functioning, attention, and memory; significant

impairment in reading comprehension; and was incapable of solving rudimentary

calculations using a pencil and paper.  In particular, he found that Harris was mildly to

moderately impaired in her ability to hold information in her mind and manipulate it,

moderately to severely impaired in her ability to learn and remember new material;

severely impaired in those abilities that underlie the planning and organization of

purposeful, goal-directed behavior (including a severe impairment in her ability to carry

out structured, multiple-step tasks; planning and self-monitoring her behavior; and

adjusting her habitual behavior in response to feedback); and had reading

comprehension at a fifth grade level.  Dr, Layton referred to particular responses to

tests and correlated results across tests and with Harris's reported behavior in

describing his findings.

Dr. Layton opined that his findings were consistent with the effects of acquired

neurological dysfunction resulting from anoxia following Harris's cardiac arrests.  Dr.

Layton concluded:

> Ms. Harris is so severely impaired that if she were to lose the level of support
> currently supplied by her husband, she would be helpless to care for herself.
> Moreover, given the combination of her severely impaired memory and ability to
> organize, control and plan behavior, she is unable to effect any plan to control
> her environment effectively and safely.  Therefore, not only is she totally disabled
> with respect to employment, she is unable to live independently.  Although she
> has survived being alone at home during most of the day for three years, she will
> not be able to manage an emergency that requires her to alter habitual
> behaviors.  That is, she is at significant risk when on her own.  She absolutely
> should not be driving. . . .
>
> Given the fact that this examination was completed more than three years after
> the 2/03 cardiac arrest, there is no reason to expect any future significant
> neurological recovery from the point of view of functional or vocational activity. . .
> . [Harris] requires--and will require for the remainder of her life--total care from

her husband, other family members (if available), or professional care providers, not only to maintain safety but also to insure that her basic vegetative needs are met.

Tr. at NCC00487-88.

On June 14, 2006, Blum wrote Harris to inform her that her appeal of Liberty Mutual's decision to terminate her benefits had been denied.  Tr. at NCC00470. According to Blum, Harris's appeal was reviewed by an independent health care professional, Bob L. Gant, Ph.D., certified by the American Board of Professional Psychologists and the American Board of Clinical Neuropsychologists and licensed in the state of Texas.  Tr. at NCC00472-76.  Dr. Gant found that Dr. Layton's evaluation was deficient because (1) it did not include any measures of symptom magnification, effort, or malingering; (2) it included only partial administration of several tests; and (3) it did not include personality testing.  Dr. Gant found these deficiencies to be crucial in light of the legal action between Harris and National City.  He also stated that he was limited in his ability to analyze Dr. Layton's test results because Dr. Layton had failed to report Harris's scores in his evaluation.  Dr. Gant also found that the recent information supplied by Dr. Burma did not indicate medical issues, such as hypertension, sufficient to support Harris's claims of disability.  For these reasons, according to Blum, the Claims Appeal Committee determined that Harris did not meet the definition of "disability" in the National City Corporation Welfare Benefits Plan, Long-Term Disability Plan Option.

On January 30, 2008, Harris initiated the instant action.  (Doc. No. 1.)  On March 24, 2008, Plaintiff filed an amended complaint, naming National City ("National City") and the National City Corporation Welfare Benefits Plan as defendants and alleging

-18-

that the defendants terminated her long-term disability ("LTD") benefits in violation of the terms of the Plan.  (Doc. No. 16.)  Harris brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Defendants filed a counterclaim seeking to reduce any award of LTD benefits by the amount of benefits awarded to Harris by the Social Security Administration ("SSA"). (Doc. 19.)

## II.  Standard of Review

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action 'to recover benefits due to him under the terms of her plan, to enforce her rights under the terms of the plan, or to clarify her rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

If the ERISA plan at issue grants the plan administrator discretion to determine benefit eligibility or interpret the plan's terms, a court may reverse a decision of the plan administrator only if was arbitrary and capricious.  *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 709-10 (6th Cir. 2000).  Harris concedes that the Plan grants the administrator discretion in this case.  Accordingly, the court will review the administrator's decision to determine whether it was arbitrary and capricious.

This standard of review is highly deferential, but it "does not require [the court] merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.2004).  The administrator's decision must be "the result of a deliberate, principled reasoning process . . . supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).   The court will accept the administrator's decision so long as "it is possible to

-19-

offer a reasoned explanation" for it. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Perry v. United Food & Workers Dist. Unions* 405 & 442, 64 F.3d 238, 241 (6th Cir.1995)).

In determining whether a decision is arbitrary or capricious, the court must take into consideration several factors.  The court should examine whether the plan administrator based the decision to deny benefits on a file review rather than on a physical examination of the applicant.  *Bennett v. Kemper Nat'l Servs., Inc.* 514 F.3d 547, 552-53 (6th Cir. 2008).  The court should also consider whether the plan administrator failed to take into account the SSA's determination that the applicant was totally disabled.  *Id.*  Finally, the court must consider whether the plan administrator had a potential conflict of interest.  *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008).  "Such findings do not change our standard of review, but they do factor into our analysis when determining whether the administrator's decision was arbitrary or capricious."  *Bennett*, 514 F.3d at 553.

### III.  Analysis

Harris contends that defendants' decision denying benefits was arbitrary and capricious.  Harris advances three assertions in support of this argument:  (a) Dr. Gant's review of Harris's file lacked the thoroughness necessary to provide the basis for a deliberate, principled reasoning process to support the decision to deny Harris benefits; (b) defendants failed to reconcile the denial of benefits with the SSA's decision to award benefits to Harris; and (c) National City has a conflict of interest as both the payor and plan administrator.

### A.      Whether Dr. Gant's Review Was Sufficiently Thorough

Harris maintains that Dr. Gant's review of Harris's file lacked thoroughness. Specifically, Harris complains that neither Dr. Gant nor any other doctor examined her on defendants' behalf.  Instead, according to Harris, Dr. Gant's opinion relies on adverse credibility findings when there is no reason to doubt the applicant's credibility and contradicts the opinions of examining physicians on the basis of a file review.

Harris argues that defendants' failure to order the physical examination of Harris prior to the denial of Harris's appeal demonstrates that defendants' termination of benefits was arbitrary and capricious.  Although, the Sixth Circuit has found nothing "'inherently objectionable about a file review by a qualified physician in the context of a benefits determination . . . 'a plan's decision to conduct a file-only review - especially where the right to [conduct a physical examination] is specifically reserved in the plan - may, in some case, raise questions about the thoroughness and accuracy of the benefits determination.'" *Bennett*, 514 F.3d at 554 (quoting *Calvert*, 409 F.3d at 296 and *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (second order internal quotation omitted)).  A file review may raise such questions when the reviewer bases a conclusion that the claimant is not disabled on adverse credibility determinations, the reviewer's conclusion stands in direct conflict with objective medical data in the record, or the final determination that the claimant is not disabled is based on inconsistent file review findings.  *Bennett*, 514 F.3d at 554; *Calvert*, 409 F.3d at 296-97; *see also Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) (finding that a file review was inadequate under an "arbitrary or capricious standard" when a determination regarding credibility was a central issue in assessing disability).  Under such circumstances, the failure of an administrator to examine an applicant who claims a mental disability can

-21-

be "puzzling and troubling."  *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed. Appx. 495, 508, 2008 WL 1848773, at *12 (6th Cir. April 24, 2009).

In the instant case, defendants' failure to exercise the right to physically examine Harris is also puzzling and troubling.   Although defendants maintain that Dr. Gant performed a thorough file review and that the file review was a sufficient basis under which to terminate benefits, the record does not support this conclusion.

Dr. Gant's conclusion that Harris's claim of disability was not supported was based on Dr. Layton's alleged failure to exclude the possibility that Harris was magnifying her symptoms, not exerting full effort, or malingering and his failure to include complete tests in some cases.  Dr. Gant concluded, "Since the claimant has a current legal claim pending for monetary benefits, these additional measures would be critical in establishing the validity of this evaluation and ultimately in establishing the validity of her claim(s) of disability . . . ."  Tr. at NCC00472-73.

This is, in essence, a challenge to Harris's credibility.  The record, however, gives no reason to doubt Harris's credibility, as none of the persons examining or treating Harris has given any indication that her credibility was in any way doubtful.[3] Given that the Sixth Circuit has indicated in both *Bennett* and *Calvert* that adverse credibility findings should be reserved to medical personnel physically examining the

---

[3]  Defendants go as far as to say Dr. Layton "performed selective testing in an attempt to skew the medical evidence in Harris's favor."  (Defendant's Opposition Brief, Doc. 35 at 10.)  There is simply no evidence of ulterior motives by either the Harris or Dr. Layton, and this statement appears to be without foundation in the record before the Court.

.

claimant, *Bennett*, 514 F.3d at 555; *Calvert*, 409 F.3d at 296, Dr. Gant's questioning of Harris's credibility after a mere file review does not have much probative value when it finds no support from examining and treating physicians.

Dr. Gant's dismissal of Dr. Layton's findings is particularly troubling in light of the agreement between Dr. Layton's findings and those of Dr. Anstandig.  Both sources who were qualified to assess Harris's mental condition and who examined Harris were in agreement that she could not work.  The source who did not examine Harris rejected this finding.[4]

Dr. Gant's opinion is based on the implication that Harris is not credible and is not supported by the medical evidence in the record.  Under these circumstances, a file review is inadequate, even under the lenient standard of "arbitrary or capricious."

Defendants respond that it was Harris's obligation under the Plan to obtain the necessary medical support to establish her disability.  This argument is not well taken.  Liberty Mutual knew by February 2004 that Harris suffered from residual memory impairment and impaired control function processing.  On August 5, 2005, A. Harris

---

[4]  Dr. Gant's dismissal of Dr. Layton's opinion is particularly troubling in light of Liberty Mutual's past determination that Harris was disabled and qualified for LTD benefits. Defendants argue that Harris may not rely on old medical records to support current disability and cite *Soltysiak v. UnumProvident Corp.*, 2002 WL 34434752 (W.D. Mich. 2002), to support this assertion.  In *Soltysiak*, the court held that a plan administrator's decision to terminate benefits was not arbitrary and capricious where the administrator disregarded medical opinions from three years prior and instead relied upon recent examinations to determine the claimant was not currently disabled.

*Soltysiak* is notably different from the instant action in that in *Soltysiak*, the plan administrator had the benefit of recent examinations by independent medical personnel who opined that the claimant was no longer disabled.  In the instant case, the only then-current assessment of Harris's condition, Dr. Layton's, indicated that Harris continued to be disabled.

requested that Liberty Mutual send all written communication to him rather than to Harris because Harris tended to forget about and lose letters.  Nevertheless, with two exceptions, defendants continued to send all written communications to Harris.  The only exceptions concerned defendants' attempts to recover overpayments from the Harrises, not communications designed to notify the Harrises that they must obtain additional support for their claims.

Defendants did not attempt to change their policy of writing to Harris until Liberty Mutual wrote to Harris on February 21, 2006,  asking for her authorization to speak to A. Harris regarding her claim.  This delay of more than six months between A. Harris's request and the attempt to obtain authorization to fulfill that request is inexplicable and inexcusable, particularly as defendants immediately acceded to A. Harris's request when their own interests were at stake.  The Harrises should not bear the burden of defendants' failure to respond to A. Harris's request in a timely manner.  The court regards favorably, therefore, Harris's assertion that she was prejudiced by defendants' insistence on sending to her, rather than to A. Harris, written requests for additional support for her claims.

**B.      Whether the Decision Reconciled the Denial with the Award of Social Security Benefits**

Harris also argues that defendants' failure to reconcile their determination that Harris is not totally disabled with the SSA's decision that Harris is disabled is a factor in favor of finding that the plan's decision to terminate benefits was arbitrary and capricious.

The Sixth Circuit has held that the failure of a plan administrator to discuss a

disability determination by the SSA may be considered as a factor in determining the arbitrariness of the plan's decision to deny benefits. *Glenn*, 461 F.3d at 669; *see also Calvert*, 409 F.3d at 295. The failure to discuss a SSA decision is particularly relevant where the plan administrator encourages the claimant to apply for SSA benefits, financially benefits from the claimant's receipt of SSA benefits, and then fails to explain why it is taking a position that differs from the SSA regarding the claimant's alleged disability. *Id.* In the instant action, it is clear that the plan required Harris to seek SSA benefits and reduced Harris's LTD benefits by the amount awarded by the SSA.

The failure to consider the SSA's decision to award benefits does not necessarily mean, however, that the plan administrator's decision was arbitrary and capricious. An SSA determination is not dispositive of the decision to award LTD benefits when no explanation of the determination exists in the administrative record. *See Hall v. National City Corp. Welfare Benefits Plan*, 2008 WL 1901388 (N.D. Ohio 2008).

In the instant case, the plan administrator asked Harris to produce an SSA disability examination report to verify the severity of Harris's disability. Harris failed to do so. The only SSA document in the administrative record is an SSA award letter stating that Harris is disabled and that she is entitled to SSA benefits. Without an explanation of the SSA's decision or a discussion of the evidence supporting it, the plan administrator cannot be expected to discuss the award and explain why the plan administrator's reasoning differs from the SSA on the matter. Harris's arguments on this point are not well-taken.

**C.** **Whether National City Has a Conflict of Interest as the Payor and Plan Administrator**

-25-

Harris maintains that National City has an apparent conflict of interest because it serves as both plan administrator and payor of benefits.

In *Metropolitan Life Insurance Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343 (2008), the Supreme Court ruled that where an administrator is both the evaluator and payor of claims a conflict of interest exists.   Courts shall weigh this conflict of interest as a factor in determining whether an administrator abused its discretion.  *Id.* at 2348. The amount of weight assigned to the conflict of interest is determined on a case by case basis.  While the *Glenn* Court did not clearly define how this conflict of interest is to be weighed, it made clear that this factor, like any other factor, "will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessarily depending upon the tiebreaking factor's inherent or case specific importance." *Id.* at 2351.   The conflict of interest "should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of  whom the inaccuracy benefits."  *Id.*

Harris argues that under *Glenn*, the conflict of interest should be weighed in Harris's favor because National City funds a trust that pays the claims of its employees and hires and employs the individuals who make the benefit determinations. Defendants do not dispute the existence of an apparent conflict of interest, but argue that the conflict is irrelevant because no evidence exists that National City was motivated by self-interest in the instant action.

Defendants cite two unpublished, *pre-Glenn*, Sixth Circuit opinions in support of

their assertion that a court must take a conflict of interest into account only where significant evidence exists that the insurer was motivated by self-interest.  *See Wages v. Sandler O'Neill & Partner, L.P., 37 Fed. Appx. 108, 112 (6th Cir. 2002),* and *Pflaum v. UnumProvident Corp., 175 Fed. Appx. 7, 9 (6th Cir. 2006).*   However, *Glenn* does not require a such a showing.  In fact, Chief Justice Roberts wrote a concurring opinion specifically finding fault with the majority's approach, which "would allow the bare existence of a conflict to enhance the significance of other factors already considered by reviewing courts, even if the conflict is not shown to have played any role in the denial of benefits."  *Glenn, 128 S.Ct. at 2352-53* (Roberts, C.J., concurring).

National City had a conflict of interest in the instant case, and that conflict must be weighed in favor of Harris.  National City makes the final decision to determine eligibility for benefits and is also the payor of benefits, which presents an apparent conflict of interest under *Glenn, 128 S.Ct. at 2349-50.*  Although no significant evidence exists that National City was acting solely of self-interest in this case, there is also no evidence that National City has any internal safeguards, such as those suggested by the Supreme Court, to ensure that this conflict interest did not affect the decision to terminate benefits in this case.   Thus, the conflict of interest is a factor has some weight in determining whether defendants acted in an arbitrary and capricious manner.

In sum, defendants' determination that Harris is not disabled was not made as the result of "a deliberate, principled reasoning process."  *Glenn, 461 F.3d at 666.*  Dr. Gant rejected the opinions of examining physicians on the basis of a file review by questioning Harris's credibility.  A file review is insufficient in the Sixth Circuit under these circumstances.  Defendants failed for more than six months to act according to A.

Harris's instructions regarding how best to contact the Harrises, thus prejudicing them in their attempts to marshal evidence in support of Harris's claims.  Finally, although it has no effect on the result, National City had a conflict of interest in the present case.  For all these reasons, the court concludes that defendants determination that Harris was not disabled was arbitrary and capricious.

### V.  Conclusion

Because the decision to terminate LTD benefits was not the result of a deliberate and principled reasoning process supported by substantial evidence, the case is remanded to defendants for a full and fair review consistent with this opinion.  *See Bennett*, 514 F.3d at 556.  Thus, Harris's Motion for Judgment on the Administrative Record is GRANTED with respect to finding judgment in favor of Harris on the issue of whether defendants' decision was arbitrary and capricious and DENIED with respect to Plantiff's request to award benefits.  Defendants' Motion for Judgment on the Administrative Record  is DENIED.[5]

IT IS SO ORDERED.

s/ *Nancy A. Vecchiarelli*
United States Magistrate Judge

DATE:  April 21, 2009

---

[5]  Defendants' counterclaim seeks an offset for social security benefits received if the court awards Harris long-term benefits.  As this Court declines to award benefits to Harris at this time, defendants' counterclaim for a reduction of benefits if benefits were awarded is not ripe for decision.